# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### April 9, 2002 Session

## JOHN PARKER ROE v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. P-22397     Joseph B. Dailey, Judge**

---

**No. W2000-02788-CCA-R3-PC - Filed November 20, 2002**

---

The Defendant, John Parker Roe, was convicted by a jury of first degree premeditated murder. His conviction was affirmed on direct appeal. See State v. John Parker Roe, No. 02C01-9702-CR-00054, 1998 Tenn. Crim. App. LEXIS 39 (Jackson, Jan. 12, 1998), perm. appeal denied (Tenn., Jan. 4, 1999). The Defendant subsequently filed for post-conviction relief, alleging that he received ineffective assistance of counsel at trial. After an evidentiary hearing, the post-conviction court denied relief. This appeal followed. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which DAVID G. HAYES and JAMES CURWOOD WITT, JR., JJ., joined.

Douglas A. Trant, Knoxville, Tennessee, for the appellant, John Parker Roe.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and Amy Weirich, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In this appeal from the trial court's denial of post-conviction relief, the Defendant's primary contention is that his trial lawyers were ineffective. However, he also claims that he was denied due process because one of his jailers sat on the jury that convicted him, and that the State committed prosecutorial misconduct by failing to disclose certain information about a witness and by making certain statements during closing argument.

## STATUTE OF LIMITATIONS

As a preliminary matter, we address the State's contention that the petition was filed outside the statute of limitations. The State did not raise an issue about the timeliness of the filing in its response to the petition; rather, the State raised this issue for the first time on appeal. The State

bases its contention solely on the filing date stamped on the face of the petition, which indicates that the petition was filed outside the one-year limitations period.

During the oral argument of this case, counsel for the Defendant stated that the issue concerning the filing date had been discussed by the parties in open court prior to the hearing on the petition. The Defendant's counsel further stated that the trial court determined, after questioning the court clerk, that the filing date stamped on the petition was incorrect and that the petition had in fact been timely filed. Counsel further stated that the Assistant District Attorney General who represented the State in the post-conviction proceedings in the trial court agreed that the petition was timely filed. In response to the Defendant's lawyer's statements, the Assistant Attorney General representing the State during oral argument asserted that the State simply relied upon the date which was stamped on the petition. At oral argument, this Court suggested to the Defendant's counsel that he consider seeking to supplement the record to reflect that the petition had been timely filed. Subsequent thereto, this Court ordered that the record be supplemented with a copy of the trial court's order dated April 19, 2002 which stated that the trial court had previously found that the petition was "received by the Clerk's office on December 31, 1999 and was considered filed at that time, that simply a clerical error in the Clerk's office resulting in the petition being stamp filed January 12, 2000, . . . ."[1]

The State subsequently requested this Court to reconsider the order allowing the record to be supplemented with the trial court's order. The State argued that our order made improper use of Rule 36 and improperly allowed the trial court to "re-write history" in this case. Given the State's insistence that a factual dispute remained in the case, we granted the State's request and remanded this matter to the trial court for the purpose of conducting a hearing and allowing the parties to present evidence and be heard on the issue of the timeliness of the filing of the Defendant's petition for post-conviction relief.

The trial court conducted the hearing on July 19, 2002. The trial court subsequently entered an order, much of which we deem appropriate to incorporate herein:

> The Court conducted an evidentiary hearing pursuant to the Order of the Court of Criminal Appeals entered on May 24, 2002. The Petitioner called three witnesses as well as introducing four exhibits.
> First, the Petitioner called Lasherrie Harris, who is and was at the end of 1999 and in the beginning of the year of 2000 employed in the mailroom which receives all mail for the Shelby County Criminal Court Clerk. A log book is kept for all UPS packages which are received. Ms. Harris brought with her and a copy was introduced of a log entry from January 3, 2000, which showed a UPS package

---

[1] This Court allowed the filing of the supplemental record because we viewed the trial court's order to be one which corrected a clerical mistake. Clerical mistakes in the record and errors in the record arising from oversight or omission may be corrected by a court at any time. <u>See</u> Tenn. R. Crim. P. 36.

having been received from the office of Douglas A. Trant to the Criminal Court Clerk. This log book i[s] kept in the normal course of business and the entry was made by Ms. Harris herself.

The Petitioner next called Joe Warren who is a Deputy Criminal Court Clerk. One of his responsibilities is maintaining the files of this Court in the normal course of business. He brought with him the file in this case which is Docket Number 22397. Within that file were located four documents of particular pertinence to this hearing. First, there were two copies of a letter dated December 30, 1999 from Douglas A. Trant to the Criminal Court Clerk. Those letters were cover letters stating that enclosed with the letter was the Petition for Post Conviction Relief for filing and stated that in the abundance of caution the Petition was being sent by two means, UPS and Express Mail, in order to insure that it would be filed before the statute of limitations ran on January 4, 2000.

Also within the file were the two envelopes from UPS and, also, the Express Mail envelope which showed that it had been mailed from Douglas A. Trant's office on December 30, 1999 and was received by the mailroom on behalf of the Clerk on December 31, 1999 with a receipt signature by the addressee.

Petitioner next called Pat Vincent who at the time of these events was head of operations for the Criminal Court Clerk's office and had been for some 26 years. He testified in the normal course of business the Clerk's office retrieved its mail from the mailroom at least once and often twice a day. He said when the issue of this filing arose he checked into the matter and discovered that the stamp filed date on the Petition of January 12, 2000 was a clerical error and that, in fact, the Petition had been received by the Clerk on December 31, 1999 as was evidenced by the matters previously referred to above in the file of the Criminal Court Clerk.

The State introduced no evidence.

It is clear from the evidence introduced that the Petitioner not by one but two methods made sure that his Petition was timely filed and did so prior to the expiration of the statute of limitations on January 4, 2000. The Petition was addressed to the Criminal Court Clerk at its appropriate address and was received by the Clerk's agent, the mailroom. If the mailroom or the Clerk did not route it to its appropriate place, that is not the fault of the Petitioner who did everything he could to make sure that it was timely filed. He sent it to the appropriate address within the appropriate period of limitations and the Petition was received not once, but twice, by the agent of the Clerk's office within the statute of limitations. To adopt the State's argument that Petitioner would be responsible for making sure that it

got to the mailroom to the Clerk's office would be a travesty of justice and certainly undermine the intent of the legislature and the Supreme Court and the enactment of our statutes and rules governing post-conviction petitions and their filing.

The Court holds, now for the third time, that this Petition was timely filed. . . .

It is ordered that the clerical error of the filing date of the Petition be corrected to indicate that the Petition was filed on December 31, 1999. Tenn. R. Crim. P. 36

. . . .

Taking issue with the trial court's findings of fact and conclusions of law, the State argues that the Defendant has failed to demonstrate by clear and convincing evidence that his petition for post-conviction relief was received by the clerk on or before January 4, 2000. The State contends that the record does not establish that the mailroom was an "agent" of the clerk; rather, the evidence merely establishes "habit evidence that employees of the clerk's office routinely went to the mailroom at least once and maybe twice a day to retrieve the mail."

We find the State's argument unpersuasive. The proof adduced at the hearing established that the mailroom for the Criminal Court Clerk's office received an Express Mail envelope from defense counsel on December 31, 1999 and a UPS package from defense counsel on January 3, 2000. Testimony further established that the court clerk retrieved its mail from the mailroom at least once a day. Finally, the director of operations of the criminal court clerk's office testified that he investigated the matter and determined that the package "was here timely." A post-conviction petition filed by an attorney is "filed when it is received by the clerk of court." Tenn. Sup. Ct. R. 28, § 2(G). The proof contained in the record supports the trial court's conclusion that the petition in this case was filed timely, and this issue is therefore without merit.[2]

---

[2]The procedural history of this case gives this court an opportunity to note our concerns about the State raising the statute of limitations defense for the first time on appeal. Pursuant to the 1995 Post-Conviction Act, "[n]o court shall have jurisdiction to consider a petition filed after" the one-year statute of limitations has run, absent unique circumstances not pertinent to this case. Tenn. Code Ann. § 40-30-202(b)(1). Furthermore, the Act imposes an affirmative duty on trial courts to dismiss petitions "[i]f it plainly appears from the face of the petition, any annexed exhibits or the prior proceedings in the case that the petition was not filed . . . within the time set forth in the statute of limitations . . . ." Id. § 40-30-206(b). Because the timely filing of the petition is a "jurisdictional" fact, we are hesitant to consider the issue waived if not raised in the trial court. In this case, the statute of limitations ran on January 4, 2000. The petition was stamped "filed" on January 12, 2000. The State did not raise an issue about the timeliness of the filing in its response to the petition. The record of the original hearing on the petition contains no reference to the statute of limitations issue. At the commencement of the hearing on remand, the trial court stated that the statute of limitations issue had been discussed prior to the original hearing on the merits of the petition, and that the court determined at that time that the petition had been properly and timely filed. Unfortunately, that discussion was not included in the record brought before this Court. On appeal, for the first time, the State contended that the petition must be dismissed as untimely. Given the jurisdictional nature of the timely filing requirement, it behooves the State to raise this issue at the trial level because,

(continued...)

We turn now to the issues raised by the Defendant in this appeal. First, however, a brief review of the facts adduced at trial will be helpful.

## FACTS

The Defendant was a police officer with the Memphis Police Department. At about seven o'clock on the morning of September 16, 1994, the Defendant called fellow officer Carl Fowler and asked him to come to the Defendant's house. Mr. Fowler testified that the Defendant told him over the phone that Michelle, the Defendant's wife, had run off. When Fowler arrived about an hour later, he noticed that Michelle's car was there. Fowler asked the Defendant where Michelle was, and the Defendant replied, "It's worse than you think." The Defendant then told Fowler that he had shot Michelle and that she was in "the bottoms," an area of scrubland behind the Defendant's house. The Defendant told Fowler that he and Michelle had been hunting rabbits, and that he accidentally shot her in the head with his service revolver. When Fowler told the Defendant that they needed to call the police, the Defendant adamantly refused.

Mr. Fowler was a good friend of the Defendant and had spent considerable time with him, both on and off the job. Fowler testified that he "thought [he] knew [the Defendant] very well, and the person [he] ran into that day was not the John [he'd] ever met." Fowler explained that he had smelled an odor of alcohol on the Defendant. Fowler testified that, in his opinion, the Defendant was "mentally ill" that morning, and explained that earlier that week, the Defendant had told him that he had heard voices coming out of the heating vent. Fowler described the Defendant's behavior on the morning in question as "weird" and "strange." Convinced that the Defendant could not control his own behavior, Mr. Fowler became fearful for his own life and left.

Mr. Fowler flagged down Deputy William Hughes with the Shelby County Sheriff's Department and told him about the shooting. When Deputy Hughes arrived at the Defendant's house, he found the Defendant sitting on the tailgate of his truck drinking a beverage. Hughes asked the Defendant where his wife was, and the Defendant replied, "[S]he could be anywhere." Hughes noticed that the Defendant was perspiring very heavily.

---

[2](...continued)

as in this case, findings of fact may become necessary to determine whether a petition was, in fact, filed timely. See, e.g., Sup. Ct. R. 28, § 2(G) ("If papers required or permitted to be filed by these rules are prepared by or on behalf of a pro se petitioner incarcerated in a correctional facility and are not received by the clerk of the court until after the time fixed for filing, filing shall be timely if the papers were delivered to the appropriate individual at the correctional facility within the time fixed for filing."). It becomes apparent that the date stamped on the face of a petition for post-conviction relief is not necessarily the date which determines whether the petition was timely filed. Whether a petition is timely filed involves issues of fact. When the State asserts the statute of limitations as a defense, a petitioner should have the opportunity for an evidentiary hearing on the issue. This Court cannot make findings of fact and an assertion of an untimely filing made for the first time on appeal may, as in this case, require this Court to remand the matter to the trial court in order to determine whether the trial court had jurisdiction to entertain the petition. Otherwise, in order to accept the State's argument on appeal, we would be placed in the position of having to assume that the trial court exceeded its jurisdiction, without giving the petitioner an opportunity to demonstrate facts establishing jurisdiction. Here, we conclude that assumption would have been incorrect.

Officer Anthony Chambers arrived as back-up and entered the Defendant's house. There he found Michelle's body lying on the bed. She had been shot in the head and a towel was draped over the wound. Hughes subsequently arrested the Defendant who, according to Hughes, appeared "[v]ery calm." The Defendant's profuse sweating concerned Hughes, however, and Hughes asked a paramedic to check his vital signs. Paramedic Randall Wayne Rhodes testified that the Defendant's heart rate and respiration were higher than normal, and that he appeared disoriented, or "spaced out." The Defendant denied having taken any drugs and told Rhodes that he had been under a lot of stress.

Sergeant F. B. Roberts arrived on the scene and spoke with the Defendant as he sat in the squad car. Roberts testified that the Defendant "seemed very confused" and never told him what had happened. He described the Defendant's conversation as "irrational." In the house, Roberts found an empty bottle of whiskey and four bottles of an over-the-counter drug called "Mini-Thins" in the trash. Other bottles of Mini-Thins containing pills were found throughout the house.

Larry Graham, a long time friend of the Defendant, visited the Defendant while he was in jail. There, the Defendant told Mr. Graham both that the killing had been accidental and that he didn't know/remember what had happened. Graham stated that the Defendant had appeared "glaze-eyed," and "wasn't the person that [he] knew."

Daniel Kaltreider testified that he met the Defendant through his cousin, John Barnette. Mr. Kaltreider attended a bar-b-cue in the spring of 1994 that the Defendant and Michelle also attended. There, he testified, the Defendant told him "that he had a tremendous amount of rage at his wife," and that he was going to kill her. Kaltreider testified that the Defendant asked him if he thought the Defendant could "get away with it" if the Defendant "said it was an accidental discharge." When Kaltreider replied no, because he would have to testify against the Defendant, the Defendant stated, "Then I'll have to kill you." The conversation continued, according to Kaltreider, with the Defendant stating, "Well, I'll just have to play crazy for about seven -- six months."

John Barnette had known the Defendant several years and testified that the Defendant's marriage with Michelle was "rocky." He stated that the Defendant had told him that the Defendant wanted to divorce Michelle and also spoke of wanting to kill her. The Defendant told him that he had choked Michelle at one point and thought about killing her then.

On cross-examination, Mr. Barnette testified about the massive amounts of Mini-Thins that the Defendant was taking in 1994. Barnette testified that he saw the Defendant taking ten to fifteen of these tablets at a time. He explained that these pills, combined with the Defendant's drinking, caused the Defendant to develop a Dr. Jekyll/Mr. Hyde personality. Barnette testified that the Defendant spoke to him about hearing voices and seeing ghosts. The Defendant became very paranoid and suspicious about Michelle. During the summer of 1994, Barnette testified, the Defendant's conversations became incoherent, irrational, and "bizarre." Barnette described the Defendant as "out of his head" and testified that he became "deeply concerned" about the Defendant because of his increasingly irrational behavior.

Peter Connelly was one of Michelle's teachers at the college which Michelle attended. Mr. Connelly testified that, two days before her death, Michelle told him that the Defendant had abused her and threatened to kill her. She wrote down her parents' phone number and asked Connelly to call them if she did not show up for her next class. When Michelle failed to attend her next class on the morning of her death, Connelly called her parents. Michelle's mother subsequently went to the Defendant's house, arriving while Officer Fowler was there.

Expert testimony established that Michelle was killed by a single gunshot to her head, fired from twelve to twenty-four inches away. The bullet was fired from the Defendant's police service revolver.

Dr. O'Brian Cleary Smith, who performed the autopsy on Michelle, was asked on cross-examination about ephedrine, the active ingredient in Mini-Thins. Dr. Smith testified that, when taken fifteen tablets at a time, "it has the same effect as an overdose of amphetamine. It can be an irritant to the heart and set up cardiac arrhythmia -- in other words, irregular heartbeat. It can also be very stimulating to the central nervous system of the brain causing the person to act in an irrational manner, to have hallucinations or to see things or feel things that aren't there."

Elton Douglas, one of the Defendant's jailers, testified on behalf of the Defendant. He explained that the Defendant was on suicide watch for five days after his arrest. During this time, the Defendant was confused and engaged in incoherent mumbling, refusing regular conversation. When asked to compare the Defendant's behavior during his first month in jail to the several months preceding trial, Mr. Douglas stated, "[I]f I was to ask him a question [recently], he would answer it; where then, if I was talking to him, there was no reply or no thought process involved."

Clyde William Keenan of the Memphis Police Department also testified on behalf of the Defendant. He had supervised the Defendant for approximately two years. When called to the scene, he found the Defendant lying in the back of the squad car, "half way on the seat and half way into the floorboard." When the Defendant sat up, Keenan testified, he had a "wild look about him" and was sweating profusely. The Defendant asked Keenan, "[W]hat's going on?" and stated, "[E]verything is breaking up." Keenan testified that he concluded at the time that the Defendant had "completely snapped" and was mentally ill. He told the sheriff's deputies at the scene that "[t]his young man is over the edge." He also testified that, at the time, the Defendant had not been capable of consenting to a DUI test.

Ted Hansom, the Defendant's first attorney, testified that he saw the Defendant when the officers initially brought him into the station. He stated that the Defendant was "unable to communicate," "not coherent," and "not oriented." He testified that the Defendant had been "unable to understand what was going on."

### INEFFECTIVE ASSISTANCE OF COUNSEL

The Defendant's primary complaint about his trial lawyers is that they failed to put on adequate proof about his mental state at the time he killed his wife. He contends that, had they put

on physical evidence and expert testimony about the effects of ephedrine, he would have been able to successfully defeat the State's proof that he killed his wife with premeditation and deliberation.[3]

To sustain a petition for post-conviction relief, a defendant must prove his or her factual allegations by clear and convincing evidence at an evidentiary hearing. See Tenn. Code Ann. § 40-30-210(f); Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). Upon review, this Court will not reweigh or reevaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. See Momon, 18 S.W.3d at 156; Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). The trial judge's findings of fact on a petition for post-conviction relief are afforded the weight of a jury verdict and are conclusive on appeal unless the evidence preponderates against those findings. See Momon, 18 S.W.3d at 156; Henley, 960 S.W.2d at 578-79.

The State sought the death penalty in this case. Accordingly, the Defendant was represented at trial by two lawyers, Edward Witt Chandler and Wayne Emmons. Mr. Chandler has been licensed since 1967, practicing primarily in criminal defense. He testified at the post-conviction hearing that he has handled more than one hundred murder trials and numerous death penalty cases. Mr. Emmons has been licensed since 1970 and also focuses on criminal defense. He, too, had handled capital cases prior to the Defendant's.

Both lawyers testified that they wanted to pursue a defense of insanity[4] and to introduce evidence that the Defendant lacked the specific intent necessary to commit premeditated murder,[5] based on the Defendant's cycle of drug and alcohol abuse. When they filed their notice to do so, the trial court ordered the Defendant to submit to an evaluation by Dr. Lynn Zager. On trial counsel's advice, the Defendant refused to submit to this evaluation. As a result, the trial court ruled that the Defendant could put on no expert proof concerning his mental state at the time of his wife's death.

At the post-conviction hearing, the Defendant testified that at the time he killed his wife, he was taking thirty to forty ephedrine tablets a day, followed by six Sominex tablets and up to a fifth of alcohol to sleep. Dr. Jonathan Lipman, a neuropharmacologist, testified that one of the effects of chronic abuse of ephedrine is "paranoia. The individual starts to hallucinate . . . [and does not]

---

[3] At the time the Defendant shot and killed Michelle, first degree premeditated murder required that the killing be done intentionally and with premeditation and deliberation. See Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 1994).

[4] At the time the Defendant killed Michelle, insanity was an absolute defense to a crime if "at the time of [the crime], as a result of mental disease or defect, the person lacked substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform that conduct to the requirements of the law." Tenn. Code Ann. § 39-11-501(a) (1991). See also State v. Jackson, 890 S.W.2d 436, 440 (Tenn. 1994).

[5] The introduction of this type of evidence is frequently mischaracterized as a "diminished capacity defense." See State v. Phipps, 883 S.W.2d 138, 143 (Tenn. Crim. App. 1994).

know that [he is] hallucinating. [The individual] actually hear[s] . . . voices. Typically the voices come from a place that you can't see . . . for instance, behind a door; or you hear it through a wall." Dr. Lipman testified that the syndrome resembled "a form of the endogenous condition called schizophrenia. And people in this condition become very frightened. They believe that people are plotting against them. They have the delusion of persecution. They don't sleep because the drug keeps them awake."

Dr. Lipman testified that the amount of ephedrine the Defendant was taking was "a ridiculously-large dose." Dr. Lipman was able to confirm the dosage consumed by the Defendant by analyzing the ephedrine content of a sample of the Defendant's hair. The analysis revealed that the Defendant had a record high level of ephedrine in his system at the time he killed Michelle: so high that "the lab ha[d] never seen anything like it." Combining ephedrine with alcohol, according to Dr. Lipman, "can have the unfortunate effect of unleashing [the user's] response to [the] unreasonable fear [arising from the ephedrine-induced paranoia]." Dr. Lipman also testified that six Sominex tablets a night was a "crazy" dose.

When Dr. Lipman was asked if, in his expert opinion, the Defendant was, at the time he shot his wife, able to form the mental culpability required to commit premeditated murder, Dr. Lipman replied, "I believe he wasn't in such a state of clear consciousness that he could have been considered culpable."

Dr. Pamela Auble, a psychologist, also testified at the post-conviction hearing. She met with and evaluated the Defendant in the fall of 1999, and reviewed documents prepared by Dr. Lipman. She was provided with information about the Defendant's use of ephedrine, alcohol and Sominex in conjunction with her evaluation. She found that there was "significant" alcohol abuse and ephedrine abuse starting in the early 1990s and escalating up until the time of the killing. She testified that the combined use of ephedrine, alcohol and Sominex "with [the Defendant's] personality and the factors going on at the time, would have affected his functioning." One of the "factors," she explained, was sleep deprivation, which aggravated the Defendant's "impairments in reasoning and judgment and impulse control." Additional factors causing psychological stress included the Defendant's difficult marriage, his dislike of his job, and a house that the Defendant was working on at the time. Dr. Auble testified that, in her professional opinion, the Defendant was not capable of forming the intent required for premeditated murder due to his chronic mental disease.

Mr. Chandler, one of the Defendant's two trial lawyers, testified that he advised the Defendant not to talk to Dr. Zager because he was convinced that she would testify that the Defendant had no mental illness or disease, that he knew what he was doing when he shot Michelle, and that he was able to control his behavior. One of the reasons for Mr. Chandler's decision was that Dr. Zager and the prosecutor were "big personal buddies," and he believed that Dr. Zager would find whatever the prosecutor wanted her to find with respect to the Defendant's mental state. Mr. Chandler explained that he knew Dr. Zager "from a number of cases" and felt that she was "extremely biased against defendants." Mr. Chandler testified that Dr. Zager's anticipated testimony that the Defendant was sane would cause them to lose "the best defense [they had]" and "would

knock out the defense." Mr. Chandler stated that he did not think that Dr. Lipman's testimony would overcome Dr. Zager's anticipated testimony, and for that reason, he decided that the better strategy was to argue to the trial judge at the close of the State's proof that the State did not carry its burden of proving the Defendant sane.[6] Mr. Chandler testified that, in his experience, jurors do not like the insanity defense. Accordingly, he stated, he "was trying to win the case with the trial judge." Mr. Chandler stated that he "was absolutely convinced" that they were going to create an issue of sanity with their lay witnesses. In hindsight, Mr. Chandler admitted, his advice to the Defendant regarding Dr. Zager might have been a mistake. However, he also testified that "there wasn't any doubt in [his] mind at the time [they] were doing the right thing."

Mr. Emmons also testified that the trial strategy was to put on sufficient lay proof of the Defendant's insanity to shift the burden of proving the Defendant's sanity to the State. He explained that they had three very strong lay witnesses with which to accomplish this goal.

At the close of the State's proof at the Defendant's trial, Mr. Chandler moved to acquit the Defendant of first degree premeditated murder on the grounds that the State had not adduced sufficient proof that the Defendant had killed Michelle with premeditation and deliberation, and on the grounds that the State had "failed to prove sanity sufficient enough to send the case to the jury." The trial court overruled the motion.

Both the Sixth Amendment to the United States Constitution and Article I, § 9 of the Tennessee Constitution guarantee a defendant the right to representation by counsel. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). This right to counsel includes the right to effective counsel. See Strickland v. Washington, 466 U.S. 668, 686 (1984); Burns, 6 S.W.3d at 461; Baxter, 523 S.W.2d at 936.

To determine whether counsel provided effective assistance at trial, the court must decide whether counsel's performance was within the range of competence demanded of attorneys in criminal cases. See Baxter, 523 S.W.2d at 936; Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). To succeed on a claim that his or her counsel was ineffective at trial, a defendant bears the burden of showing that counsel made errors so serious that he or she was not functioning as counsel as guaranteed under the Sixth Amendment and that the deficient representation prejudiced the defendant resulting in a failure to produce a reliable result. See Strickland, 466 U.S. at 687; Burns, 6 S.W.3d at 461; Hicks, 983 S.W.2d at 245. To satisfy the second prong, the defendant must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the defendant's guilt. See Strickland, 466 U.S. at 694-95. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; see

---

[6]At the time the Defendant was tried, the State was required to prove a defendant's sanity beyond a reasonable doubt upon the defendant adducing proof that he was insane at the time of the crime. See State v. Jackson, 890 S.W.2d 436, 440 (Tenn. 1994). The Defendant's lawyers' trial strategy was to put on sufficient lay proof of the Defendant's insanity to shift the burden of proof to the State to prove his sanity.

also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994); Owens v. State, 13 S.W.3d 742, 750 (Tenn. Crim. App. 1999).

When reviewing trial counsel's actions, this Court should not use the benefit of hindsight to second-guess trial strategy and criticize counsel's tactics. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982); Owens, 13 S.W.3d at 749. Counsel's alleged errors should be judged at the time they were made in light of all facts and circumstances. See Strickland, 466 U.S. at 690; Hicks, 983 S.W.2d at 246.

In its order denying post-conviction relief, the trial court stated, "It is this Court's opinion that the explanations set forth by Mr. Chandler and Mr. Emmons are very plausible and demonstrate that they provided outstanding representation to Mr. Roe both before and during his trial. . . . [T]he representation provided by Mr. Chandler and Mr. Emmons was professional and appropriate in every regard. . . . It is this Court's opinion that the petitioner in this cause received outstanding representation in every regard by his trial counsel."

This Court has carefully reviewed the transcripts of both the trial and the post-conviction hearing. There is no doubt that the Defendant's trial lawyers provided him with reasonable and competent representation. There is also no doubt that the Defendant's trial lawyers deliberately chose a course of action which precluded their putting on the witness stand two very powerful expert witnesses. Defense counsel had a very difficult tactical decision to make about how best to present the Defendant's defense of insanity and evidence of his diminished capacity to form the required mens rea of premeditation and deliberation. In hindsight, Mr. Chandler admitted that perhaps they chose the wrong alternative. However, hindsight is not the proper lens thorough which to view a claim of ineffective assistance of counsel. The Defendant's trial lawyers made a strategic decision after a thorough investigation into the facts and legal theories, and after repeated pretrial efforts to maintain their defense while avoiding an evaluation by Dr. Zager. "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996). While the Defendant and his trial lawyers may wish that they had chosen a different course of action following the Defendant's conviction, this Court is not inclined to criticize strategic trial decisions made in conjunction with the level of legal skill brought to bear in this case. To do so would be to call into question almost every strategic decision made on behalf of criminal defendants in this state. Post-conviction relief on the basis of ineffective assistance of counsel is aimed at addressing incompetent representation; not representation that simply fails to defeat the State's case. In short, the Defendant has failed to prove by clear and convincing evidence that his trial lawyers' performance fell below the standard of competence demanded by our constitutions. Accordingly, this issue is without merit.

The Defendant raises as a separate issue that his trial lawyers were ineffective "for not developing physical evidence to support the abuse of ephedrine with a hair sample." The Defendant argues that his hair sample was not tested for ephedrine until after his trial, and that his attorneys erred in not having it analyzed before trial. However, such evidence would have required expert testimony for its introduction and explanation. Such expert testimony was precluded by the trial

-11-

court's pretrial order and, given that we have concluded that the Defendant's trial lawyers were not ineffective in pursuing the strategy that resulted in that order, we further conclude that they were not ineffective in failing to perform scientific tests that they knew they would not be able to introduce at trial. Accordingly, this issue is without merit.

The Defendant also contends that his trial lawyers were ineffective in allowing one of his jailers to sit on the jury. When asked about this decision, Mr. Chandler testified that he "knew it was a little bizarre" to have one of the Defendant's jailers on the jury, but he explained that they had a "world-famous" jury consultant who advised keeping that particular juror. Mr. Chandler testified that, although the Defendant objected to keeping this juror, he decided to follow the consultant's advice. Mr. Emmons also testified that, based on the consultant's advice, that juror was not challenged.

Again, decisions regarding jury challenges are tactical decisions not subject to being second-guessed by this Court. This claim of ineffective representation is also without merit.

The Defendant also complains that his trial attorneys did not call witnesses James Hughes and Tracey Johnson[7] at trial. Hughes testified at the post-conviction hearing, stating that he had seen Michelle on the evening before her death; that he saw no bruises on her face; and that she and the Defendant planned to spend that evening together shopping and attending the Defendant's birthday party. Tracey Johnson was one of the Defendant's fellow officers and had known the Defendant since high school. He testified at the post-conviction hearing about the Defendant's heavy ephedrine use.

Mr. Chandler testified that he did not call these witnesses because of concern about their credibility. He also stated that he didn't think Sgt. Johnson "painted [the Defendant] as a really nice guy." Mr. Emmons testified that he didn't think Hughes's testimony would have assisted the defense.

The Defendant's attorneys' decisions not to call these witnesses were made after reviewing their proposed testimony and after making a reasonable, informed judgment call that these witnesses would not be beneficial to the defense. This Court will not second-guess these strategic decisions. This issue is without merit.[8]

## OTHER ALLEGATIONS

In addition to claiming that he was denied the effective assistance of counsel, the Defendant contends that he was denied due process because one of his jailers sat on the jury. Larry Collins, one of the deputy jailers where the Defendant was housed pre-trial, testified at the post-conviction

---

[7]At the post-conviction hearing, the witness identified himself as Tracey Johnson. For reasons which are not clear from the record, Mr. Johnson is referred to by the parties as Tracey Gossett.

[8]For the same reasons, we reject the Defendant's contention that his attorneys were ineffective for not introducing into proof the receipts from the Defendant's shopping trip and dinner with Michelle the night before her death.

hearing that he had seen the Defendant in jail prior to serving as one of the Defendant's jurors. Mr. Collins stated that he worked on the floor where the Defendant was housed "a couple of times." He also stated that his having seen the Defendant in jail factored into his verdict "[s]omewhat." However, Mr. Collins also testified that he listened to and looked at all the evidence and followed his oath as juror. Mr. Collins disclosed his status as one of the Defendant's jailers during voir dire.

We disagree with the Defendant that Mr. Collins' service as one of his jurors violated his due process rights. Although Mr. Collins testified that his prior contact with the Defendant affected his verdict "somewhat," the record does not reflect in what way his verdict was affected. Defense counsel hoped that Mr. Collins would prove a sympathetic juror because the Defendant had been on suicide watch for several days while in jail. Indeed, we may speculate that Mr. Collins was more reluctant to convict the Defendant than other jurors just as readily as we may speculate that he was more prone to convict the Defendant. However, this Court cannot find a constitutional violation based on speculation. It is the Defendant's burden to prove his allegations by clear and convincing evidence. The Defendant has not done so. Nor has he cited this Court to any rule of law holding that a jailer subsequently serving as a juror is, per se, a due process violation. Accordingly, we find this issue to be without merit.

Finally, the Defendant argues that the State committed prosecutorial misconduct during his trial. He first contends that the State improperly argued "missing witnesses" during closing argument; that is, the State posed the rhetorical question, "What witness -- not lawyer -- what witness testified to what psychosis even is, let along that the defendant had one? -- what witness?" However, this issue could have been raised on direct appeal. Accordingly, this issue has been waived. See Tenn. Code Ann. § 40-30-206(g).

The Defendant also contends that the State committed prosecutorial misconduct when it failed to divulge to him prior to trial that Michelle's parents had signed a movie contract concerning the case. The Defendant claims that this information was exculpatory and should have been disclosed pursuant to Brady v. Maryland, 373 U.S. 83 (1963). The Defendant argues that such information proved bias on the part of Michelle's mother, who testified at trial, and therefore would have been useful in cross-examination.

We acknowledge, of course, that the prosecution is required to disclose to a criminal defendant evidence which is favorable and material to his or her guilt, including evidence which may be used to impeach the State's witnesses. See generally, id., 373 U.S. at 87; Johnson v. State, 38 S.W.3d 52, 55-56 (Tenn. 2001). To establish a Brady violation, an aggrieved defendant must prove four things: (1) that he or she requested the information (unless the information is obviously exculpatory — in which case the State must disclose it whether requested or not); (2) that the State suppressed the information; (3) that the information was favorable to the defendant; and (4) that the information was material. See Johnson, 38 S.W.3d at 56.

Here, the Defendant testified that he became aware that Michelle's parents had signed a movie contract after reviewing a copy of the district attorney's file in conjunction with filing his

post-conviction petition. No copy of any document from the district attorney's file was introduced in support of this allegation. Even accepting this testimony at face value, however, the Defendant's claim of a <u>Brady</u> violation fails because the information does not meet the definition of "material."

Under <u>Brady</u>, withheld evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985). Here, the "withheld" evidence could have been used to impeach Michelle's mother. However, Michelle's mother was not a key witness to the prosecution, and her bias was already established by her relationship to the victim. Furthermore, although Mr. Chandler testified that the information would have been "great cross examination," we fail to see how it would have helped the Defendant's case even if Michelle's mother's credibility had been completely destroyed at trial. Her testimony was simply not that important to the State's case. Accordingly, this issue is without merit.

In summary, the Defendant has failed to prove his allegations by clear and convincing evidence, and we therefore affirm the judgment of the trial court.

 

 

_____
DAVID H. WELLES, JUDGE